NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TEAMSTERS AND ALLIED WORKERS,
HAWAII LOCAL 996, etc., and Arthur
A. Rutledge and Harry Kuhia, Jr., Respondents.

No. 17922.

United States Court of Appeals
Ninth Circuit.
Jan. 29, 1963.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles and Janet Kohn, Attys., N. L. R. B., Washington, D. C., for petitioner.

Charles K. Hackler, Los Angeles, Cal., for respondents.

Before BARNES and BROWNING, Circuit Judges, and MADDEN, Judge of the Court of Claims.

MADDEN, Judge.

The National Labor Relations Board, hereinafter called the Labor Board or the Board, has petitioned this Court for enforcement of the order which the Board, on December 27, 1961, made against the respondents. The Board's order is reported at 134 N.L.R.B., No. 157. Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e), confers jurisdiction upon this Court to enforce the Board's orders in proper cases. The Board's finding that the employment relations involved in the case were sufficiently concerned with commerce to enable the Board to take jurisdiction of the case is not contested by the respondent.

Twentieth Century-Fox Film Corp., hereinafter called Fox Film, an enterprise engaged in the production of motion pictures with headquarters in Hollywood, California, produced the film South Pacific in the summer and early fall of 1957. The production took place on the island of Kauai, one of the outlying islands of the then Territory of Hawaii. It was necessary for Fox Film to make arrangements, in advance of production, for a supply of labor, including carpenters, painters, motor vehicle drivers and special motor equipment operators, at the remote location where the picture was to be filmed. The Association of Motion Picture Producers, of which Fox Film was a member, had for some years had contracts with various unions of several crafts affiliated with the AFL-CIO, including a contract with Hollywood Local 399 of the International Brotherhood of Teamsters. The Inter-

national Brotherhood will be designated hereinafter as Teamsters. Teamsters had a local unit in Hawaii named Hawaii Local 996, of which local Arthur Rutledge was president.

In the spring and summer of 1957, in Honolulu and in Hollywood, there were discussions between officials of Fox Film and Rutledge with regard to the furnishing of drivers and special equipment operators for the South Pacific filming. The last discussion, on July 1, 1957, in Hollywood, resulted in some conclusions which Fred S. Meyer, then Fox Film director of industrial relations, embodied in a letter dated July 2 and sent to Rutledge in Honolulu, Rutledge having departed for Honolulu immediately after his July 1 conference with the Fox Film officials.

There has been much consideration in the report of the Board's Trial Examiner, the Board's decisions, and the briefs and arguments of the parties in this case, of the language and meaning of the Meyer letter. The Board concluded that the agreement embodied in the letter constituted a closed shop contract between Fox Film and Rutledge's Hawaii Local 996. Such a contract is, under § 8(b) (2) [1] of the National Labor Relations Act, 29 U.S.C. § 158(b) (2), an unfair labor practice. We will discuss the Meyer letter later in this opinion. For present purposes, the letter clearly committed Rutledge to making available to Fox Film drivers "in such numbers as may, in our [Fox Film's] best judgment be necessary to properly service our construction requirements." This was, of course, a weighty obligation on the shoulders of Rutledge and his local, in view of the remoteness of the location where the work was to be done.

When Rutledge got back to Hawaii, having available jobs for members of his Teamsters' Local, he decided to put in order a matter which had been annoying him. One E. F. Nilson, a contractor

---

[1]. Section 8(b) (2) of the N.L.R.A., 29 U.S.C. § 158(b) (2), provides:
"(b) It shall be an unfair labor practice for a labor organization or its agents—
\* \* \* \* \*
"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."
Subsection 8(a) (3), 29 U.S.C. § 158 (a) (3) provides:
"It shall be an unfair labor practice for an employer—
\* \* \* \* \*
"(3) by discrimination in regard to hire on tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

operating on Kauai, had a considerable number of drivers in his employ. They, with other Nilson employees, had in May, 1957, joined the Operating Engineers union, which was also affiliated with the AFL-CIO. Nilson had been requested to recognize the Operating Engineers union and bargain with it, but had rejected the request, and about June 17 most of his employees had struck in protest against the refusal to recognize their union.

It was Rutledge's view that the drivers should be in the Teamsters union and not in the Operating Engineers union. On July 5, 6 and 7, Rutledge, together with Harry Kuhia, the vice-president of Rutledge's Local 996, held a series of meetings with a number of the Nilson driver strikers. Rutledge and Kuhia informed these men that the Teamsters union was recognized as the exclusive representative of all transportation workers on the Fox Film project, that they could get jobs on that project only if they were members of the Teamsters union, that there would be an initiation fee of $50, dues of $5 per month, and an assessment of 10% of their wages. They told the men that the Operating Engineers should not have invaded the Teamsters' jurisdiction, that if they joined the Teamsters union that union could intervene in the forthcoming National Labor Relations Board election which Nilson had petitioned for, and it was suggested that Rutledge could settle the Nilson strike, presumably after the Teamsters union had been elected the exclusive bargaining agent of the Nilson employees.

Rutledge and Kuhia distributed cards for application for membership in the Teamsters union. The $50 initiation fee, which was double the regular Local 996 initiation fee, and the assessment of 10% of earnings did not meet with favor. Not until the third meeting, on July 7, did any substantial number of the men sign application cards. On July 7, however, 28 of them did so. On the basis of these cards, Teamsters Local 996 was permitted to intervene in the Nilson election proceeding. On July 12,

a National Labor Relations Board election was agreed to, at which the Nilson employees could vote for the Operating Engineers, Teamsters Local 996, or no union. The election was set for July 18.

In the meantime, after the July 7 meeting of Rutledge and Kuhia with the Nilson strikers, several strikers who had signed cards applying to join the Teamsters obtained jobs with Fox Film. Fox Film's Location Captain Palamountain, who had been advised by Rutledge that when the project needed drivers Palamountain should request them from Kuhia, used Kuhia as "a hiring hall, sort of." Kuhia, himself a Fox Film driver as well as being vice president of Local 996, would prepare time cards, obtain social security numbers and tax forms for the persons whom he selected for employment and assign the employees to the vehicles or equipment which they were to operate. The number and kind of available jobs depended on the stage of progress of the film project.

The Nilson election was held on July 18. Of the 60 eligible voters, 41 cast valid ballots; 33 voted for the Operating Engineers; 8 voted for no union; no vote was cast for Teamsters Local 996. Rutledge and Kuhia were, naturally, disappointed and annoyed by the vote. A contributing cause to the lack of Teamster votes had probably been a false or mistaken representation made to the employees by one Aki that the Teamsters union had agreed that the drivers for Fox Film were to receive a wage substantially lower than the wage for laborers.

The election took place early in the morning of July 18. On that same day Kuhia said that he was going to have the satisfaction of firing Mr. Nakaahiki or some of the other boys who were employees of Nilson working on the movie set and who did not vote for Teamsters. Since no one had voted for Local 996, there was no possibility of mistaken identification. When Nakaahiki appeared for work on the morning after the election, Kuhia discharged him. On that day and the next Kuhia discharged the

six other Nilson strikers who had been given jobs on the Fox Film project only about a week earlier. Kuhia replaced the discharged drivers with men, presumably Teamster members, from Honolulu. He explained to the Fox Film employment supervisor that the discharged men had to be discharged because they were not in good standing with the union.

■ The Board's finding that the discharges were discriminatory and were violations of Section 8(b) (1) (A) and 8(b) (2) of the National Labor Relations Act is well supported by the evidence set out above. Since the Fox Film project in Hawaii was a temporary one, the Board did not order reinstatement of the discharged employees. It did, however, order the payment by the respondent union of back pay to the discharged employees for the period during which they were deprived of employment as a result of the unfair labor practices, but it deferred determination of the amount of back pay to the "compliance stage" of its proceeding. These actions of the Board are approved.

The Board ordered the union respondent, Teamsters Local 996, to reimburse each of the drivers and special equipment operators who worked on Fox Film's South Pacific project "for all money unlawfully exacted from them for initiation fees, dues, and weekly assessments." The Board's order incorporated by reference the Trial Examiner's report as to this phase of the case. From that report we learn that the Board regarded as "unlawfully exacted" all initiation fees, dues and weekly assess-

ments which were paid to Teamsters Local 996 by any person employed on the project who was not, before obtaining that employment, a member of the Teamsters union. The persons found to have been members before their employment on the project were the drivers who came from Honolulu to Kauai and three named residents of Kauai. As to those persons, already members of the union, they were ordered reimbursed only for the payments which they made in excess of the regular union dues, i. e., the assessments of 10% of their wages. We will discuss the evidence relating to the collection of these sums by Local 996.

■ It will be remembered that Rutledge and Kuhia, in the series of meetings with the Nilson strikers on July 5, 6 and 7, told them that they could not get employment on the Fox Film project unless they joined Teamsters Local 996, and that the initiation fee would be $50, the monthly dues $5 and that there would be an additional assessment of 10% of their wages. All these exactions as conditions of obtaining employment are forbidden by the National Labor Relations Act. Even if a union has already been chosen by the majority of employees in a unit, and has made a union shop contract, which is the most stringent form of union security contract which the law permits, with the employer, initial hiring of employees may not be conditioned upon union membership. All that can be required is that new employees, after thirty days of employment, must begin to pay, and continue thereafter to pay, the regular union charges, 29 U.S.C. § 158(b) (2) and (b) (1) (A).[2]

<hr />

2. 29 U.S.C. § 158(b) (2) appears in footnote 1, supra.

29 U.S.C. § 158(b) (1) (A) provides: "It shall be an unfair labor practice for a labor organization or its agents— "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: * * *."

Section 7, 29 U.S.C. § 157 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."

The representations made by Rutledge and Kuhia, Kuhia being a supervisory employee of Fox Film with authority to hire and discharge, would have a highly coercive effect upon men anxious to get jobs. Such coercion being forbidden by the statute because it is an interference with and restraint of free choice by employees, the Board was justified in concluding that initiation fees, dues and assessments paid by persons to whom these representations had been made had been paid under coercion and should be refunded to them. During the fifteen week period of the South Pacific project, Kuhia and his assistant, one Naumu, kept up the pressure for the payments. In the middle of August, Kuhia and Naumu assembled the driver employees and Naumu told them that as long as they paid the 10% of wages assessment and the initiation fee and other financial obligations to the union they would stay on the movie job, and after the movie job was over they would not have to maintain Teamster membership.

Collection efforts were reasonably successful. More than $9,000 was collected during the 15 weeks of the project, in initiation fees, dues and percentages of pay from employees who had had no previous connection with Local 996, and in percentages of pay from those who were members at the time of their employment.

■■ The Board, as we have seen, has ordered the union respondent to reimburse all these employees for these charges, distinguishing, however, between those who were already Teamster members and those who were not, as to the types of charges which should be reimbursed. The union vehemently protests this feature of the Board's order. It urges that the Board's order is based on the assumption that no one joins a union and pays the union's initiation fee and dues and assessments unless he is coerced to do so. It says that reimbursement is not justified unless it is reimbursement to an individual person who is proved to have been, individually, unlawfully coerced into making the payments in order to get or keep his job. It urges that the Supreme Court of the United States, in Local 60, United Brotherhood of Carpenters v. N. L. R. B., 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961), in effect so holds. We do not so read the Local 60 case. In that case, Local 60 made an illegal closed shop contract with an employer. But the employees were already members of the Carpenters' union, and to them it made no difference whether they worked under a closed shop, which the law forbade, or a union shop, which would have been lawful. The illegal effect of the closed shop was only upon non-employees, who could not get jobs unless they first joined the union. The union members were, presumably, as willing to pay their dues as they had been before the closed shop agreement was made. The effect of requiring reimbursement of such dues would not have been to put money back in the pockets of workmen from whose pocket it had been abstracted against their will, but to punish the union for violating the law. Since the procedure provided in the National Labor Relations Act is an administrative, quasi-judicial procedure employing orders to cease and desist, and to restore the *status quo ante,* rather than a criminal procedure employing fines or imprisonment as sanctions, the Board may not order reimbursement which is only punitive. Republic Steel Corporation v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

*Local 60* seems to us to decide nothing about the necessity for a finding of particularized individual coercion brought to bear upon each separate employee. It would be a unique doctrine of law that would prevent the Board, if it is convinced by the evidence that, in the circumstances, an illegal threat of discharge made to one or several of a relatively small body of workmen had the effect of coercing others or all of the workmen in the group, from making a finding to that effect and basing an order on that finding. In the Board's appraisal of the problem, the circumstances would be of great importance.

In the instant case, the group of Nilson strikers who, at the third meeting addressed by Rutledge and Kuhia, signed applications to join Teamsters Local 996 did so because of the representation to them that they had to join Local 996 in order to get work at the Fox Film project. Their votes at the Nilson election showed that not one of them wanted to join Local 996. Their prompt discharge by Kuhia within two days after the election made plain to everyone who wanted to work at the Fox Film project that Kuhia had the authority to do what he threatened to do. Actually, he did not succeed in collecting all the union charges from all the drivers who worked on the project, of whom there were 89. Many of them apparently worked for only short periods, and left the job before Kuhia had succeeded in collecting the union charges from them. Rutledge had promised Fox Film to man the job, and Kuhia could not insist on payment of the $50 initiation fee in advance, from men who claimed to be unable to pay it.

The respondent points out that there were 26 men on the payroll at one time or another who never paid anything to the union. That would show that the collection of the charges was difficult and somewhat sporadic, but it would not, in the face of the reiterated insistence that one's job was dependent upon payment of the demanded charges, show that persons who valued their jobs and paid the charges were not coerced by the threats to make the payments. The respondent stresses particularly the situation of the employees, most of whom came from Honolulu to the island of Kauai to get work, who were already members of Teamsters Local 996. It purports to see no basis for the Board's conclusion that they would not, in addition to the initiation fee which they had already paid, and the regular dues which they were currently paying, have been willing to pay 10% of their weekly wages to the union as a special assessment. It seems to us, as it did to the

Board, that it would be hard to think of any reason why they would have been willing to pay this heavy assessment or would have paid it at all, except for fear that their jobs would be jeopardized, as they were warned they would be, by failure to pay it.

Our conclusion is that the Board's finding and order in regard to reimbursements to employees of charges and assessments is adequately supported by the evidence and is in accord with the National Labor Relations Act.

■ The respondents urge that Fox Film's contract with Studio Transportation Drivers, Local 399 of the International Brotherhood of Teamsters, which is a Hollywood local of the same International union with which Local 996 was affiliated, was applicable to Fox Film's employment of drivers on Kauai. The respondents urge that since the Studio contract provided for a union shop, what they did on Kauai was lawful. On the respondent's own assumption, their conduct would not have been lawful. A union shop contract would only have justified Fox Film in requiring that drivers hired by it become union members within the first 30 days of their employment or be discharged at the end of the 30 days,[3] and would have justified the respondents in insisting that Fox Film enforce those conditions. But it would not have legalized Rutledge's and Kuhia's representations to men who had not yet been employed by Fox Film that they could not be employed unless they joined the union. Nor would it have legalized Kuhia's discharge of the complainants within the first thirty days of their employment, because of pique at their not having voted for his union. Nor would it have legalized the collection of larger than usual initiation fees or the irregular assessment of 10% upon the earnings of the drivers. The application of the Studio contract to the Kauai project would, then, have made little if any difference in the outcome of the case.

■ We think the Trial Examiner's conclusion, adopted by the Board, that

3. See Section 8(a) (3), 29 U.S.C. § 158(a) (3), in footnote 1, supra.

the Studio contract did not apply to the Kauai project is well supported by the evidence. The language of that contract did not make it applicable. The testimony on behalf of the respondents that local hirings on distant locations were made under the applicable terms and conditions of the Studio contract may well have meant only that the wage rates and working conditions for such hirings would be the Hollywood rates and conditions. Meyer, Fox Film's director of industrial relations, seems not to have been aware of even that much of an obligation, so far as the Kauai project was concerned, because he tried to put into effect a wage rate far below the Studio contract rate.

■ As to the respondent's contention that by oral agreement between Rutledge and Fox Film, or by some prior oral agreement made expressly or by implication from conduct of the parties, the Studio contract was made applicable to the South Pacific project, we suppose it is not competent for parties to an existing labor agreement to expand or contract at their will the scope of the unit which shall be covered by the agreement. When the question of the scope of the unit is formally contested, the decision is made by the Board. In the absence of any formal contest and determination by the Board, it would seem not to be permissible for an employer which is setting up a new plant or project a thousand miles away from its existing plant to agree with a union that its employees in the new plant must become members of the union. The employees should have a voice in deciding that question which is of primary interest to them.

■ The Labor Board concluded that, at the July 1, 1957, conference between Fox Film's agent Meyer and Local 996's president Rutledge, an illegal exclusive hiring agreement, i. e., a closed shop agreement, was made. The Board found that the practices of the parties in actual operations on the job confirm that conclusion. The Board's Trial Examiner

had come to the opposite conclusion on this question.

Meyer's letter of July 2 summarizing the July 1 agreement read, in pertinent part, as follows:

" * * * you have assured us that without limitation or hindrance of whatever nature, you will make available and furnish us Teamster Members of the AFL-CIO in such numbers as may, in our best judgment, be necessary to properly service all our Construction requirements * * * The men so furnished by you during their employment by us will be and remain Members in good standing of the AFL-CIO."

The meaning of the letter is by no means unambiguous. But the last sentence in the quoted portion of the letter does say that union membership should be a condition precedent to employment. The Teamsters union says that in the actual application of the agreement on the job, Teamster membership was not regarded as necessary for employment. It points out that as late as July 17, Fox Film was trying to obtain drivers through one Aki, a representative of the Honolulu Building and Construction Trades Council. A local of the Operating Engineers union was affiliated with that council, and that union accepted motor vehicle drivers as members, as we have seen in the discussion of the Nilson election. But whether or not Fox Film's efforts in this direction indicated their interpretation of Meyer's letter as not being an exclusive hiring agreement with Teamsters seems unimportant. There is no evidence that the Teamsters' officers and representatives, Rutledge and Kuhia, acquiesced in such an interpretation. And early in the project, Fox Film made Kuhia a supervisory employee with power to hire and discharge employees, and acquiesced in his discharge of the former Nilson employees a few days after they were hired because, as he said, they were not in good standing with the Teamsters union.

Teamsters points out that, of the 89 drivers who worked on the project at one time and another, 56 never were union members. In the circumstances, however, this apparently impressive figure does not prove that there was open hiring on the job, as the law requires. It proves only that Kuhia was not able to keep the job manned, as Rutledge had agreed with Fox Film that it would be manned, if he made Teamster membership an inflexible condition of employment. It would have been intolerable that a temporary project such as the filming of South Pacific on a remote island should be obstructed or seriously delayed because otherwise available drivers could not pay union initiation fees before they began to earn wages. The job having no future and most of the men having no interest in the future of the union, they worked but did not join the union, and 26 of the drivers never paid anything to the union.

The agreement between Meyer and Rutledge, in its application on the job, effected a closed shop contract to the extent that the union could make it so and still fulfill its promise to man the job. Fox Film, by making Kuhia, the union's representative, its hiring and discharging agent, relieved itself of any responsibility for policing the agreement. If Kuhia hired a non-union man or hired a man on his promise, never fulfilled, to join the union and pay its charges, Kuhia's union was in no position to complain to Fox Film of a breach of the agreement.

We approve the Board's conclusion that the respondent union and Fox Film entered into an illegal closed shop agreement in violation of Section 8(b) (2) of the National Labor Relations Act.

We think that Harry Kuhia, being a respondent and one of the two individual active participants in the unfair labor practice, should not be granted reimbursement for his payments to Local 996.

The Board's petition for enforcement of its order is granted, except as to the inclusion of Harry Kuhia among the persons entitled to reimbursement, together with a corresponding modification of the notice which the Board directs the respondents to post.

Enforcement granted, with a modification.