329 F.2d 259
 117 U.S.App.D.C. 304
 LOCAL 1351, STEAMSHIP CLERKS AND CHECKERS, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO, et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HOUSTON MARITIME ASSOCIATION, INC., Master Stevedores
Association of Texas andthe Individual Respondent
Companies Who Are Members of the
Associations, Respondents.
 Nos. 17521, 17631.
 United States Court of Appeals District of Columbia Circuit.
 Argued Oct. 23, 1963.
Decided Feb. 13, 1964, Certiorari Denied June 22, 1964, See
84 S.Ct. 1921.
 
 Mr. Herbert S. Thatcher, Washington, D.C., for petitioners in No. 17521.
 Mr. Elliott Moore, Attorney, National Labor Relations Board, of the bar of the Supreme Court of Georgia, pro hac vice, by special leave of court, with whom Messrs. Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for petitioner in No. 17631 and respondent in No. 17521. Mrs. Nancy M. Sherman, Attorney, National Labor Relations Board also entered an appearance for respondent in No. 17521.
 Mr. Robert Eikel, of the bar of the Supreme Court of Texas, pro hac vice, Houston, Tex., by special leave of court, for respondent in No. 17631.
 Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and FAHY, Circuit Judge.
 FAHY, Circuit Judge.
 
 
 1
 These consolidated cases involve the validity of a Board order growing out of proceedings concerning primarily the operation of a hiring hall by Local 1351, Steamship Clerks and Checkers, herein usually referred to as the Union, and by the International, in connection with the hiring of employees by the employers, designated more fully in the margin,[1] and for convenience referred to usually in this opinion simply as the Employers, with whom the Union had a collective bargaining agreement. In addition to problems arising out of the general operation of the hiring hall there are involved also charges of specific discrimination against two employees, Linnenberg and Vinson. As to the hiring hall itself the charges are that it was operated by the Union, with the International and the Employers sharing responsibility, in such a manner as to discriminate against applicants for employment who were not members of the Union.
 
 
 2
 The Board found that Vinson and Linnenberg were discriminatorily deprived of employment because they were not members of the Union and had filed unfair labor practice charges against the Union, and that the Union and its business agent, Morrow, had caused such discrimination against Linnenberg in violation of Section 8(b)(2) and (1)(A) of the Act, and along with the International had caused the discrimination against Vinson. The Employer Associations were also found to have violated Section 8(a)(1), (3) and (4) in respect to Linnenberg, and along with the Companies who were members of the Employer Associations with respect to Vinson 'by reason of being parties to the unlawful hiring arrangement which made the discrimination possible.'
 
 
 3
 In a Supplemental Decision modifying findings originally made prior to the decision in Local 357, International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), the Board also found,
 
 
 4
 'that the Respondent Associations and their Member Companies violated Section 8(a)(1)(2) and (3) by being parties to a hiring arrangement with Respondent Local 1351 which gave preference in employment to members of said Local and its sister locals and which required job applicants as a condition of employment to designate Local 1351 as their bargaining representative and pay it a percentage of their wages; by facilitating Local 1351's collection of such percentages; (and) that Respondent Unions and Local 1351's business agent Morrow violated Section 8(b)(2) and (1)(A) of the Act by maintaining and operating an unlawful hiring hall. * * *'
 
 
 5
 The reasoning of the Board and the grounds for its Decision are set forth in the record at length, and the Decision is reported.[2] It seems to us unnecessary to go into like detail in this opinion. We have concluded that the Board's findings of discrimination against Vinson and Linnenberg and against non-Union members in the operation of the hiring hall are sustained by substantial evidence considering the record as a whole, and that with one exception the order of the Board should be enforced, containing, as it does, remedial provisions appropriate, with the one exception, to the violations found. The exception is now discussed.
 
 
 6
 The Board required reimbursement to all non-Union men of the service fees-- percentage of wages-- paid by them to the Union as a charge for obtaining employment through the hiring hall. The Union and Employers were made jointly and severally responsible for such reimbursement. Reimbursement was required only of percentages exacted from non-members of the Union. Moreover, the liability of each respondent was not to extend beyond six months prior to the date of filing and service of the initial charge against it. Reimbursement is subject to a further limitation that the particular Employer's liability shall be for amounts paid only by its employees to the Union, so that one Company will not be liable for amounts paid by employees of another Company.[3]
 
 
 7
 In requiring such reimbursement the Board pointed out that the Union charged its members only nominal dues of $1.00 per month, while using the funds derived from the percentage fees, which were paid by members and non-members, to defray a large part of the Union's general expenses. In 1956, the Board continued, such general expenses included items such as per capita taxes and assessments paid to the International and also travelling expenses of convention delegates and a member's death benefits, all of which totalled far more than the Union's maximum possible dues receipts and were plainly unrelated to the operation of the hiring hall or any other activities or services which could be deemed beneficial to non-members who paid the percentages.
 
 
 8
 As to the validity of any reimbursement provision at all we first observe that the operation of a hiring hall is not in and of itself illegal, Local 357, International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), so that some charge for such service cannot be said to be incident to an unfair labor practice and therefore illegal. The question is whether the discriminatory operation of the hall supports the order for reimbursement of service fees paid by non-Union employees, since they were properly found to be the subject of the discrimination. However, non-members were required to pay the fees only when successful in obtaining employment through the hiring hall. To the extent they were discriminated against by being passed over for employment they were not required to pay any fees. And while the discrimination against non-members may have reduced the value of the services they received, the value of those services was not so minimal that no charge therefor could be considered reasonable. Consequently if the fees exacted were on an equal basis with those paid by Union members for the same services the fees themselves could not be said to be due to discrimination against non-members.
 
 
 9
 In approving affirmative action required by the Board-- here reimbursement-- we must apply the test that such action have a remedial objective and not be punitive. It is limited to 'means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act.' Local 60, United Broth. of Carpenters and Joiners of America, AFL-CIO v. N.L.R.B., 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961), citing Consolidated Edison Co. of New York v. N.L.R.B.,305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126 (1938). While the discriminatory manner of operating the hiring hall must cease, as the Board orders, it seems to us that the reimbursement portion of the order, to the extent it goes beyond placing non-members and members in an equal position, goes too far. Discrimination in the exaction of the percentages occurred to the extent non-members were required to pay more than the service justified, that is, paid for activities of the Union of which they were not beneficiaries. Affirmative action which goes beyond remedying the discrimination cannot be said to effectuate the policies of the Act. It is true that but for the discrimination against non-members we must assume more of that group would have secured employment and, therefore, have earned a greater amount of wages. But reimbursement of service fees is not sufficiently related to making whole non-members who were discriminatorily denied employment to justify reimbursement as a means of remedying their failure to obtain employment.
 
 
 10
 The test in this case is not whether non-members were coerced into paying the service fees, which was the test applied to a reimbursement order in Local 60, United Broth. of Carpenters, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). Such coercion as is incident to the operation of a hiring hall is not an unfair labor practice. Accordingly a service fee paid as an expense of conducting such a hiring method is not an exaction which must be refunded because coerced. The test here, as we have said, is whether a greater financial burden was placed upon non-members than the service rendered justified, a burden not placed upon Union members for the same service. The appropriate remedy, then, is to remedy the inequality borne by non-members. Accordingly, we take a course similar to that adopted in Local 138, International Union of Operating Eng'rs, AFL-CIO v. N.L.R.B., 321 F.2d 130, 135-136 (2d Cir. 1963), and shall remand the cases to the Board to determine such proportion of the fees paid as was reasonably related to the service provided by the Union, having in mind the cost to the Union of providing the services.[4]
 
 
 11
 Since the Employers participated in the discriminatory operation of the hiring hall they are properly made accountable jointly and severally with the labor organizations for any refunds required under the modified standard we adopt. See N.L.R.B. v. United States Steel Corp., 3 Cir., 278 F.2d 896, 898 (1960), cert. denied, 366 U.S. 908, 909, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961). That they did participate is clear from the finding that the discriminatory hiring system was effectuated in part through the knowing cooperation of the Employers' own hiring supervisors who for the most part were union men themselves and generally knew which of the hiring hall applicants were fellow union members. The Board found that these supervisors, who as union members were bound by the terms of the International's Constitution, followed that Constitution's requirement that preference in job referrals be given to union men in the operation of all union hiring halls.[5] This finding is supported by the terms of the original hiring hall agreement between the Union and the Employers, which expressly provided that preference in hiring was to be given to members of the Union and in the testimony of the hiring supervisors that although this provision was stricken in 1955 their hiring practices remained substantially unchanged. In addition to the above the Employers also facilitated the Union's collection of excessive service fees by paying their employees with two checks, one in the amount of the Union's service fee and the other for the balance of the employee's wages. These checks were handed over by the Employers to the Union, which handed the wage checks over to the employees after they had endorsed their service fee checks to the Union. These findings are supported by substantial evidence considering the record as a whole and provide a sufficient basis for the enforcement of the reimbursement order, as modified above, against the Employers as well as the Union.
 
 
 12
 Enforced in part, remanded in part for further proceedings consistent with this opinion.
 
 
 
 [1]
 The Employers are the Houston Maritime Association, Inc., the Master Stevedores Association of Texas and the twenty-eight individual Member-Companies that make up these associations
 
 
 [2]
 122 N.L.R.B. 692 (1958), modified, 139 N.L.R.B. 352 (1962)
 
 
 [3]
 The International and all Member-Companies of the Employer Associations were exempt of liability for back pay to Linnenberg in view of the fact that a finding of discrimination by them against him was barred by Section 10(b) of the Act
 
 
 [4]
 We note that the Second Circuit in its opinion in Local 138, International Union of Operating Eng'rs, supra, suggested that 'a union might under proper accounting procedures include in the cost of operating a hiring hall some reasonable percentage of the union's general expenses * * *.' See also N.L.R.B. v. General Motors, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). However, whether or not this should be done in the present situation is a matter for the Board itself to decide initially
 
 
 [5]
 This provision specifically required that when there were more jobs available than members of the local could handle preference for those jobs was to be given to members of sister locals. The Board found that implicit in this was the more basic requirement that all union men were to be given preference over non-union men