The **NATIONAL CASH REGISTER COMPANY**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

**NATIONAL CASH REGISTER EMPLOYEES' INDEPENDENT UNION**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

Nos. 71-1454, 71-1508.

United States Court of Appeals, Sixth Circuit.

Aug. 18, 1972.

946

**950**

J. Mack Swigert, Cincinnati, Ohio, for petitioner National Cash Register Co.; Arnold I. Schwartzman, Cincinnati, Ohio, B. Lyle Shafer, William C. Brafford, Dayton, Ohio, on brief.

Paul H. Tobias, Cincinnati, Ohio, for Union.

John D. Burgoyne, N.L.R.B., Washington, D. C., for the N.L.R.B.; Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Morton Namrow, Washington, D. C., John C. Getreu, Regional Director, 9th Region, N.L.R.B., Cincinnati, Ohio, on brief.

Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.

McCREE, Circuit Judge.

The National Cash Register Company (NCR) and the NCR Employees' Independent Union (EIU) petition for review of an order of the National Labor Relations Board (NLRB or Board), and the Board cross-petitions for enforcement of its order. As modified by this opinion, the Board's order is enforced.

## I. THE FACTS

In the fall of 1968, NCR and the EIU were negotiating over the terms of a new collective bargaining agreement to cover NCR's Dayton, Ohio, industrial complex, of whose 20,000 employees about 14,000 were members of the bargaining unit represented by the EIU.[1] During this period, NCR was performing certain work on military defense projects under contracts with the United States Government, and these contracts required NCR to notify the Government when "any actual or potential labor dispute . . . threaten[ed] to delay the timely performance" of these projects. When negotiations failed to produce an agreement, on October 30, 1968, NCR notified the Government of the possibility of a strike. Thereafter, Government representatives obtained the assurances of both NCR and EIU officials that measures would be undertaken to enable employees of NCR's Military Division to work during any strike that might occur.

On Monday, November 18, 1968, a wildcat strike of EIU members began. The strike was authorized by the union later that day, and it resulted in a virtual shut-down of NCR's Dayton operations. On November 19, 1968, officials of NCR and of the EIU met to discuss allowing Military Division employees to work during the strike. NCR officials stressed the "need for continuing our defense production" and the "vital nature" of some of the defense projects, and the union officials agreed to issue passes to the Military Division employees to facilitate their crossing the picket lines that had been set up by the union at most of the entrances to NCR's buildings. Company officials then telephoned the Military Division employees to notify them to come to work on November 20 and to instruct them to go to the union hall to obtain their passes.

Following the meeting between NCR and EIU officials, however, EIU president Withrow and secretary Taylor decided that the Military Division employees should be asked to contribute to the union one-third of the daily gross wages that they would earn while working during the strike. This proposal was approved by the union's executive board, and, concomitantly, the union leadership decided to suspend, with respect to the Military Division employees, enforcement of a local bylaw that established a $25 fine for any member who

---

1. We are informed by the EIU that its membership currently numbers about 100.

crossed a picket line during an authorized strike. Union officials Thomas Sturr and Edward Robbeleth testified that this procedure was adopted because the union had no other source of income at the time, the contribution was considered to be a "fair share" with respect to the strike effort, and, if it were adopted, EIU members would be less inclined to react violently on the picket line when Military Division employees crossed the line to work.[2]

On the evening of November 19, Military Division employees began reporting to the union hall to receive their passes. These employees, not all of whom were members of the EIU bargaining unit, were told at the hall by union representatives who had been delegated to distribute the passes that to receive their passes, they would have to sign the following form:

In recognition of the fact that I am being permitted by the NCR-EIU to work on my job at NCR during the period of time that an authorized strike is taking place, and further recognizing that the Union's Executive Board has recommended that voluntary contributions be accepted from all Union Members who are being permitted to work during this period, I hereby freely consent to pay one-third (33⅓%) of my gross daily wages during this period, to the Union. In consideration of such contribution, it is my understanding that I am to be furnished authorization to cross the Union picket lines for the purpose of working at NCR during this period, and that I am obligated to obtain from the Union a new work authorization on or prior to Monday of each week, for the duration of the strike.

The employees were told that they would not be permitted to cross the picket lines without signing these forms and were instructed that they could renew their passes each week only by paying one-third of the wages they had earned preceding each renewal period. Although only George Springer, a nonmember of the EIU, testified that he was overtly threatened with physical violence if he attempted to cross the picket line without having signed this form and having received a pass,[3] all the employees who

---

2. The desire to avoid anticipated violence on the picket line was particularly stressed. Sturr testified:

Q. And what did you tell those people? A. Well, I explained to them that this was being done for two basic reasons. First of all the fact that the union was cut off without any source of income during this period of time. And this, together with the fact that we felt a half a loaf was better than none, and that those who were permitted to work we felt it was no more than fair that they should contribute a chunk of their earnings, which we had established at a third, to the union.

Secondly, due to the fact—and it was a known fact—that there were many of the strikers who objected to anyone at all working, that we felt it would be more palatable to those strikers if it were known that those who were allowed to work were contributing and in that way helping the efforts of the strike.

And it was for those two basic reasons, as I explained to everyone who asked me, that this is why we were doing it. And at the same time it was explained that we would issue a pass to facilitate their going through the picket line.

Robbeleth corroborated the concern about a possible violent reaction by EIU members:

Q. And what was the purpose of giving people the pass? A. The purpose of giving them the pass that we had in mind I believe was twofold. One was identification of the personnel, that they were a group of employees that were permitted to work. And, two, as I said, to keep the violence that existed down to a minimum. And we felt that the pass would effectuate this.

Union secretary Taylor, when asked why the union decided to adopt the contribution procedure, responded that it was "[t]o help with the strike. And to appease the membership that didn't want anybody going across those lines."

3. Springer testified that, when he arrived at the union hall, he was directed to a table at which a "union man" was issuing passes. This man was engaged in a discussion with three or four Military Division employees, and he handed Springer the contribution form to read

testified indicated that the union representatives conditioned the issuance of the passes upon the signing of the contribution form.[4] Some of the employees expressly objected to signing the agreement. Of this group, some eventually decided to sign because of their desire to work;[5] others refused to sign and either stayed home for the duration of the strike,[6] subsequently agreed to sign and worked for part of the strike period, or attempted to work without having obtained a pass.[7] On the basis of this tes-

and sign. When Springer indicated a reluctance to sign since he was not a member of the EIU, the "union man" stated, in the presence of the other employees, that the company did not know anything about the contribution form but that

Well, the agreement between the company and the union is that you can go to work. But you are not going to work without this pass. And you won't get the pass unless you sign this paper.

According to Springer, he continued to object to signing the agreement:

And I said, "Well, all I was interested in was what did the company want." And he said, "Well, don't worry about that. There are going to be some pretty big boys on that picket line."

4. For example, Edward Huesman, the charging party in this case and not a member of the EIU at the time of the strike, testified that he was told at the union hall that he had to sign the contribution agreement to obtain a pass. When he objected, the union representative stated

that I had to sign [the agreement] to get the pass in order to work and that he did not care if I worked or not, That he would prefer that I didn't. That was his words. But if I was to work I had to sign this paper.

Richard Flanigan, also not a member of the EIU, testified that union official Sturr handed him a contribution form at the union hall on November 19 and told him, "Read this and sign it." After discussing the situation with some other Military Division employees, Flanigan decided to sign it even though he "didn't like it." Sturr then told him about the renewal procedure, and he allegedly stated, "If you don't want to come back in [to work the following week], don't come back [for a pass]." Frederick Seeberg, a union member, signed the agreement on November 20, and he renewed it the following week because, he testified, "it was made, I felt, a condition to work; that I had to have a pass."

5. For example, Elizabeth Rankey, not a member of the EIU at the time of the strike, testified that she went to the union hall on November 19 and that Sturr told her, after she objected to making the wage contribution, "Those men are out in picket and you're drawing a pay check. You're going to pay." She testified that she told Sturr that this was "blackmail," but that she eventually signed the form because she thought that this would help NCR perform important defense work. *See also* note 4 *supra* (testimony of Richard Flanigan).

6. Don Kesinger, an EIU member, objected to paying one-third of his wages to the union and did not go to the union hall to obtain a pass. He did not work at all during the strike. Another EIU member, Elmer Houston, at first refused to sign the contribution agreement but then changed his mind on November 22 and signed. He worked only that day, and did not work for the remainder of the strike period.

7. For example, Edward Dunn, an EIU member, refused to sign the contribution form during the first week of the strike but then changed his mind and signed for each week of the strike thereafter. His stated reason for signing was that he needed the money he would net after making the contribution. *See also* note 4 *supra*.

George Springer (*see* note 3 *supra*), after being threatened at the union hall, reported for work the next three days without a pass, but after November 22 he did not work for the duration of the strike. Richard Hill, an EIU member, testified that he went to the union hall on November 19, discovered that the union was seeking a wage contribution, and left the hall without signing the form. He worked for the next three days without a pass, but on November 22, after being sent home by the company (*see* text following note 9 *infra*), he went to the union hall and signed the agreement and received a pass. Robert Petry, also an EIU member, decided to sign the contribution agreement on November 20, but after he discovered that there was no picket line at his work entrance, he tore up the contribution form and went to work for the remainder of that week without a pass. On November 22, however, after being sent home by the company, he went to the union hall and signed the agreement again. Lloyd Hill, not a member of the EIU, refused to sign the agreement and came to work

timony, the Trial Examiner concluded that "[s]tatements made by union agents to some of the employees who protested against signing the forms leave little doubt as to the coercive nature of the Union's action."

NCR officials did not learn of the union's intention to require a wage contribution as a condition for obtaining a pass until the evening of November 19, when Military Division employees began telephoning to inform them of this procedure. They assured the employees that the contribution was not part of the company-union agreement, and they told each employee who called that the decision whether to sign the document and come to work was his to make. Over the next few days, however, this "hands off" policy of the company changed as NCR officials became increasingly apprehensive about the safety of their employees. This concern was prompted by mass picketing that was occurring at most of the entrances to the NCR complex and by several incidents of threats or violence communicated to and witnessed by NCR officials.[8] By Friday,

---

without a pass until November 22, when he was sent home by the company. He obtained a pass for the last week of the strike.

8. These events were described by various witnesses at the hearing below:

Q. Did you ever see a roving band of people moving up and down the streets and pickets? A. The first day on Monday I believe there were. We looked out the window and saw the strikers roving down Main Street. But that's the only day I can recall seeing it. [Testimony of EIU member Donald Beam.]

. . . . .

Q. Did you notice particularly any violence around the picket lines on the morning of Friday, the 22nd? . . . A. Yes. I cannot pinpoint the day. But I know one day that I came in I went through Building 26. . . . There were several police cars and a group of them. . . .
Q. You saw the police cars and an unusually larger than normal number of people? A. Yes. And that was just by walking through Building 26 to get in. You could see the police cars from the entrance. [Testimony of nonmember Elizabeth Rankey.]

. . . . .

Q. Had anything happened that led you to have concern about the safety of employees? A. Yes.
Q. Tell us about that. A. Various incidents of violence that occurred during that week. Incidents that occurred at the entrance ways to parking lots, the entrance ways to buildings. Reports that we received from employees that were concerned.
Q. Now, can you tell us a little about these reports from employees. Employees were reporting certain things that were happening? A. That threats and intimidations as they came in the doors. That their car was hit on the fender as they drove in the parking lot. That they had to wait in long lines for their car to get into the parking lot because the pickets were blocking the entrance ways.
Q. Were these employees who were working in the military department who were making these complaints? A. During the—Yes. In addition to that we had reports from other employees, too. [Testimony of K. Ross, NCR director of personnel.]

. . . . .

Q. Had you received any reports of any kind before making, in connection with things that were going on? A. Yes. And in going through the department and talking to various people there was considerable agitation and concern concerning the safety of the people. Some people were extremely anxious.
Q. Had any incidents occurred of any kind that were reported to you by these people? A. Various people had reported incidents in coming into work. Their cars had been scratched and beat on. From the vantage point in the building itself I had a personal opportunity of seeing a number of the entrances where people were coming in and leaving the plant and some of the difficulties they seemed to be encountering.
Q. Did any employees make any report of any kind about telephone calls they had been receiving? A. I became aware of one telephone call that apparently was made to one of the persons of a threatening nature.
Q. Mr. Pierce, I think you testified that you had made observations yourself through a window of some difficulties on the picket line. Would you describe what you saw? A. Yes.

November 22, company officials had become convinced that the situation was critical, and they determined particularly that employees who were attempting to cross the picket lines without union passes were likely targets of physical attacks by the strikers.[9] The company decided, therefore, on November 22, not to

. . . Rather large gatherings of people milling back and forth. Groups of people stepping in front of automobiles. Pickets. Raised arms and well-understood gestures. Various well-understood gestures as a matter of fact. . . . Pickets standing in front of cars seeking identification, trying to find out who is passing. I saw several incidents there of what I considered to be—Well, I am surprised that somebody didn't get hit by a car. I saw people having to jump out of the way of automobiles. Curses, Gestures. [Testimony of Ernest Pierce, NCR Military Division manager.]

. . . . .

Q. Now, the strike began on the 18th. And will you describe what you observed and the information you collected in the course of carrying out this assignment that Mr. Schaeffer had given you as to whether, as to the nature of the day-to-day operation of the strike by the union? A. Well, the strike started early, or the unauthorized portion of the strike started early in the morning of the 18th. And at that time thousands, probably one to two thousand persons poured out of some of the buildings. We have thirty-three separate buildings at the NCR complex. And each building houses a particular type of segment. So not all buildings were involved. But several of the buildings, the more impatient element, I would say, of the union, several thousand of them poured out and roamed the streets, up and down the streets, hollering in the windows. Trying to motion for other employees to come out and so forth. That continued well into the afternoon.

And it thinned down quite considerably except there were roving groups of pickets still around the parking lots and entrances and so on and so forth, to one of the main parking lots.

And then on the 19th, the night of the 19th, Mr. Withrow, president of the union, sanctioned the strike. Apparently they had had an executive board meeting and sanctioned the strike.

Starting the next morning—They apparently had never had a strike before. And I think they were somewhat disorganized, plus the fact that they had quite a number of people that they could not control. And—

Q. By "they" you mean the union? The union leaders? A. The union had no control over them.

So the next morning, and throughout the morning, and every morning throughout that week when employees were coming to work there would be mass groups of pickets at practically every entrance that we had at the plant. And they particularly focused on K and Patterson Boulevard. This is the entrance near Building 26 and 29. This is one of the main entrances into the main parking lot. And at the entrance to Stewart Street and Old River Road, which is the entrance running between Building 29 and 26. And large groups would congregate from, I would say six-thirty in the morning until about shortly after eight o'clock. And they would stretch a line across these entrances.

We were having quite a bit of difficulty getting police cars out there to try to—The police at first were quite reluctant to get involved in it.

The only way the employees would get in was if the cars would back up maybe a half a block or block, back up, shall we say south on Patterson Boulevard, then we could occasionally get a Dayton City Policeman, and he normally sat on a median strip out on Patterson Boulevard, to come over. He would spread the line apart and then maybe wave about ten or fifteen cars in. But if an individual car came in, or tried to get in, then they had quite a lot of difficulty and some of them were turned away.

Now, I was out there from time to time checking around, talking to members of the guard force, together with Mr. Frost, who is the head of plant protection, and who is no longer with us, and observed this throughout the week. [Testimony of William Brafford, NCR attorney.]

9. For example, Ernest Pierce, Manager of the Military Division, testified:

Q. Now, was there any particular situation on the 22nd that contributed to your calling Mr. Ross that day and asking for clarification? A. Well, if I recall correctly the 22nd was, the crowd in front of the Patterson Boulevard entrance was rather large. There were groups of people patrolling, shall I say, milling around the street area. I believe this was the day that there is evi-

permit any employee to work in the Military Division unless he had obtained a pass from the union.

The company's decision was communicated to the employees on the afternoon of November 22. They were told by their supervisors either to obtain a pass or to stay home for the duration of the strike. George Springer (a non-member of the EIU), Richard Hill (EIU member), Robert Petry (EIU member), and Lloyd Hill (non-member) did not have passes and, accordingly, were sent home by the company. Springer did not work for the duration of the strike; Richard Hill obtained a pass and worked during the strike period, as did Petry; Lloyd Hill, after the company's action, at first refused to obtain a pass but later changed his mind and worked during the last week of the strike. Edward Huesman, a non-member of the EIU and the charging party in this case, testified that he felt "coerced" by the company's action and therefore agreed to the wage contribu-

tion for the second and third weeks of the strike. Federick Seeberg, Sandra Martes, Elmer Houston, and Donald Beam, all of whom were EIU members, testified that they renewed their passes at least in part because of the company's November 22 decision.

In sum, seven Military Division employees either did not work during the strike (the strike ended December 18, 1968) or worked only part of the time because of their refusal to accede to the union's contribution requirement. And, 133 Military Division employees contributed various sums to the EIU during the course of the strike.

On November 23, NCR obtained a temporary restraining order from an Ohio state court enjoining the EIU and its agents from interfering with the ingress and egress of people and supplies at the NCR complex and limiting the number of pickets who could be maintained at the entrances to the complex. This order, however, did not immediate-

dence that there was a number of police cars that were there. It would seem to me to be an alarming situation.

. . . . .

Q. Well, I am looking at the 22nd. You said you called Mr. Ross and asked for clarification about whether or not people had to have passes. Now, why were you asking about passes particularly on that day? You had trouble I realize. But why did you call him about the pass? What did they have to do with the violence in other words? A. Well, the passes apparently is what people were using as essentially safe conduct through the picket lines.

NCR attorney William Brafford, who had been assigned by the company to maintain a close watch on the strikers' picket line activities in order to determine the necessity of obtaining an injunction, described a marked upsurge in the picket line disturbances that occurred on November 22:

On Friday morning in particular—
Q. Friday the what? A. Friday, the 22nd, there was a very large group there starting early in the morning. And they were checking passes and turning people away.

I went out close to the line on two or three occasions during the morning and observed what was going on. We had

some guards out there with cameras. I was concerned from the point of view that I wanted the line photographed because I wanted to present this evidence to the judge.
Q. It had built up to the stage where you felt that it would be necessary to go to court? A. Well, yes. It was working up. I felt that throughout the week that we had to go into the court. It was just a question of when.

We were hoping that the union would be able to control the pickets. But it became obvious during the end of the week, and particularly on this one day. Every morning I came in, like I say, Mr. Swigert, every morning I came in they were asking for passes at every entrance. A lot of people didn't have to show them because if you got in a group you could slide on by. But they were checking passes.

But this particular time—
Q. What particular time? A. On the 22nd they had gotten even more overt about it and more insistent. And when I got there in the morning this entrance about sixty feet wide, the driveway, it was completely blocked, full of pickets. So this went on all day. A lot of people being turned away with cars.

So late in the afternoon I went over there again. I got word, Mr. Frost and

ly result in the cessation of the harassment and intimidation of employees who were crossing picket lines, and the company, at the end of the second week of the strike, sought a contempt citation against one of the ringleaders of the picket line incidents. Nevertheless, pass-checking continued, at least on a sporadic basis, until the strike ended.

When the passes were renewed at the beginning of each week, union officials asked the employees how many hours they had worked during the preceding week because NCR did not supply the union with work records. On Monday, December 16, rumors of an impending settlement of the strike began to circulate, and many employees did not renew their passes for that week and did not pay the assessment on the wages they had earned the preceding week. The union has not attempted to recover these sums.

## II. THE NLRB'S CONCLUSIONS AND ORDER

The Trial Examiner held that the EIU violated section 8(b)(1)(A) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(b)(1)(A),[10] by enforcing the wage contribution, with respect to both members and non-members of the EIU, "by threats to prevent, and actual attempts physically to prevent, the employees from working." The EIU

was held coercively to have conjoined the Military Division employees' jobs with their organizational rights and to have violated section 8(b)(1)(A) by coercing the employees not to refrain from engaging in concerted activity.

The Trial Examiner held that the company violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1),[11] in two respects. First, she held that NCR officials, when they learned of the contribution requirement, had an affirmative duty to take reasonable steps to protect the employees' right to work, such as: assuring employees that they could work without obtaining passes from the union; offering passes that would identify employees as members of the Military Division; and seeking a temporary restraining order prior to November 22 and taking other "lawful steps" to protect the employees. By failing to take such action to protect the employees, NCR was held to have interfered with their right to refrain from engaging in concerted activity. Second, she held that NCR violated section 8(a)(1) on November 22 by taking the affirmative step of requiring Military Division employees to obtain passes from the union as a condition to their being permitted to continue working.

The Trial Examiner's recommended order required the EIU to cease and desist from conditioning the right of em-

---

> I got word that they were continuing to turn people away that didn't have passes. And then I also received word that Mr. Withrow was at the picket line at Patterson, K and Patterson.

10. Section 8(b)(1)(A) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents—
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein. . . .
 Section 7 of the NLRA, 29 U.S.C. § 157, provides:
 Employees shall have the right to self-organization, to form, join or assist

labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

11. Section 8(a)(1) provides:
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title. . . .

ployees to go to work through a picket line upon their agreement to pay part of their wages to the union. The order also required the EIU to reimburse the 133 employees who made wage contributions to the union and to compensate for lost wages the seven employees who did not work during all or part of the strike. NCR was required to cease and desist from "[a]cquiescing in, adopting or enforcing" any requirement that its employees pay to the union a portion of their wages as a condition of their being allowed to work. Further, the order recommended that NCR be jointly and severally liable with the EIU for compensating the seven employees who did not work for varying periods during the strike and be secondarily liable for reimbursing the 133 employees who paid the union a portion of their wages. Both parties were required to post the usual notices.

The Board adopted the Trial Examiner's findings, conclusions, and recommendations in their entirety.[12] Both NCR and the EIU have petitioned for review, and they challenge not only the Board's conclusions concerning the commission of unfair labor practices but also the affirmative remedial provisions of the Board's order.

## III. THE SECTION 8(b)(1)(A) VIOLATION

Both EIU and NCR argue forcefully that the union did not coerce the Military Division employees into signing the wage contribution agreement and that the union's decision to implement this procedure was permissible under the proviso to section 8(b)(1)(A), which protects a union's right "to prescribe its own rules with respect to the acquisition or retention of membership" in the union. For the reasons that follow, we reject these contentions.

The Supreme Court concluded in NLRB v. Allis-Chalmers Manufacturing Company, 388 U.S. 175, 184–195, 87 S.Ct.

2001, 18 L.Ed.2d 1123 (1967), that section 8(b)(1)(A) was enacted primarily to control union conduct during organizational campaigns. More specifically, the section was found to have been designed " 'to protect employees in their freedom to decide whether or not they desire to join labor organizations, to prevent them from being restrained or coerced.' " Allis-Chalmers, supra, 388 U.S. at 188, 87 S.Ct. at 2010, quoting 93 Cong.Rec. 4435 (1947) (remarks of Senator Smith). When asked to describe union conduct that would violate the proposed section, Senator Taft "responded with examples of threats of bodily harm, economic coercion, and mass picketing in organizational campaigns and coercion which prevented employees not involved in a labor dispute from going to work." Allis-Chalmers, supra, 388 U.S. at 189, 87 S.Ct. at 2011.

In addition, the Court in Allis-Chalmers repeatedly emphasized the existence of a second theme running through the legislative debate on the proposed section 8(b)(1)(A), namely, the desire not to interfere with a union's regulation of its internal affairs. For example, Senator Ball, who proposed the amendment to the Taft-Hartley Act that became section 8(b)(1)(A), did not object to the later insertion of the membership-rule proviso into that section because, he stated, " 'It was never the intention of the sponsors of the pending amendment to interfere with the internal affairs or organization of unions.' " Allis-Chalmers, supra, 388 U.S. at 187, 87 S.Ct. at 2010, quoting 93 Cong.Rec. 4272 (1947) (remarks of Senator Ball). According to Senator Ball, then, the proviso did nothing more than to codify and make explicit the preexisting right of a union to prescribe reasonable rules intended to govern the relationship of its members to the union.

As the Supreme Court also recognized in Allis-Chalmers, crucial to this

---

12. Member Fanning believed that NCR should be primarily liable for the seven back-pay awards since "it was Respondent

Company's unlawful conduct of not allowing them to work without such pass that directly caused their failure to work."

right of a union to maintain its organizational integrity is the power to carry on an effective strike:

National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. . .

. . . . . . .

Integral to this federal labor policy has been the power in the chosen union to protect against erosion its status under that policy through reasonable discipline of members who violate rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and "[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent . . . ." 388 U.S. at 180–181, 87 S.Ct. at 2006. Accordingly, the ability of a union to strike effectively, the Court observed, depends in large part on the power of a union to discipline its members for engaging in strike-breaking activities. *Allis-Chalmers, supra,* 388 U.S. at 182–184, 87 S.Ct. 2001.

These considerations persuaded the Court to hold in *Allis-Chalmers* that a union did not violate section 8(b)(1)(A) in imposing fines on its members who crossed the union's picket line and went to work during a strike, and in bringing suit for the collection of these fines. This holding was based not upon the proviso to section 8(b)(1)(A), but upon a conclusion that such disciplinary action did not constitute "restraint" or "coercion" within the meaning of that section. *See* Booster Lodge No. 405, International Association of Machinists and Aerospace Workers, AFL-CIO v. NLRB, 148 U.S.App.D.C. 119, 125–126, 459 F.2d 1143, 1149–1150 (1972) (hereinafter *Booster Lodge 405*).

■■■ It is, therefore, clear that a union does not violate section 8(b)(1)(A) by fining or otherwise reasonably disciplining members who elect to cross a picket line set up by the union in the course of an authorized strike. *See Booster Lodge 405, supra*; NLRB v. Granite State Joint Board, Textile Workers Union of America, Local 1029, AFL-CIO, 446 F.2d 369 (1st Cir.1971), cert. granted, 405 U.S. 987, 92 S.Ct. 1247, 31 L.Ed.2d 452 (1972); Rocket Freight Lines Company v. NLRB, 427 F.2d 202 (10th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970). And it is clear that a union can seek external enforcement of its internal rules at least to the extent of utilizing the courts to collect fines. *Allis-Chalmers, supra.*

However, the Court in *Allis-Chalmers* was careful to emphasize the distinction between permitting a union's regulation of its internal affairs and enforcing "a union's internal regulations to affect a member's employment status." 388 U.S. at 195, 87 S.Ct. at 2014. Two years later, in Scofield v. NLRB, 394 U.S. 423, 430, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), the Court, relying also on the intervening decision in NLRB v. Industrial Union of Marine & Shipbuilding Workers of America, AFL-CIO, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706, (1968), incorporated this distinction into a broad standard against which union disciplinary actions are to be measured:

[Section] 8(b)(1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is *reasonably enforced against union members who are free to leave the union and escape the rule.* [Emphasis added.]

In formulating the third element of this test, the Court referred approvingly both to the Board's long-standing rule that section 8(b)(1)(A) proscribes "unacceptable methods of union coercion, such as physical violence to induce employees to join the union or to join in a strike," 394 U.S. at 428 n. 4, and to its own previous holding that the policy of the NLRA is to " 'insulate employees' jobs from their organizational rights.' " 394 U.S. at 429 n. 5, 89 S.Ct. at 1157, quoting Radio Officers' Union v. NLRB, 347 U.S. 17, 40, 74 S.Ct. 323, 98 L.Ed. 455 (1954).

Petitioners contend that the union's conduct here did not violate the *Scofield* standards. NCR argues that the conditioning of the issuance of picket line passes on an agreement to contribute a percentage of wages earned during the strike was an internal rule adopted by the union that is protected by the proviso to section 8(b)(1)(A). It argues that the union did not have to permit its members to work during the strike and that, although non-members had the right to work if the company agreed to permit them to do so, the union had no obligation to give any of the Military Division employees "a free pass through the picket lines." The EIU emphasizes its right to maintain an effective picket line and argues that the "voluntary pledge program" was far less coercive than the compulsory-fine system upheld by the Court in *Allis-Chalmers*.

■ We may assume, *arguendo*, that a union may inaugurate a voluntary contribution program and request members and non-members to pay a portion of the wages they earn during a strike as a donation to the union's strike effort, *see* Youngstown Sheet & Tube Company, 130 N.L.R.B. 1295 (1961). We may assume further that the union in such a case may legitimately decide not to suspend, with respect to its members who elect not to contribute, enforcement of an internal rule imposing a fine on members who cross a picket line during a strike. Nevertheless, factual determinations still must be made whether these union rules have been reasonably enforced, whether they have been applied only to union members, and whether they can be avoided by union members' electing to leave the union. Scofield v. NLRB, *supra*, 394 U.S. at 430, 89 S.Ct. 1154. If the EIU physically prevented or threatened to prevent the Military Division employees from refraining from engaging in concerted activity, *i.e.*, forcibly prevented employees who did not sign the wage contribution agreement from crossing .the picket line to work during the strike, then the EIU used "means unacceptable in themselves" (Scofield v. NLRB, *supra*, 394 U.S. at 430, 89 S.Ct. 1154) to enforce an ostensibly internal rule. Such a finding could also be viewed as supporting a determination that the EIU linked the employees' jobs with their organizational rights by preventing those not in sympathy with the union from working. *See* Scofield v. NLRB, *supra*, 394 U.S. at 430–431, 89 S.Ct. 1154.

■ Therefore, the question concerning the union's conduct, for purposes of this appeal, resolves itself into a determination whether the Trial Examiner's finding, which was adopted by the Board, that the union used unacceptable means to prevent employees without passes from working is supported by substantial evidence on the record considered as a whole. Universal Camera Corporation v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRA § 10(e), 29 U.S.C. § 160(e).

■■ We believe that the testimony summarized in part I *supra* provides ample support for the Board's finding on this point. Initially, we observe that several employees were told by persons issuing passes at the union hall that they would have to sign the contribution agreements in order to work.[13] It is clear that, since the union delegated to these persons the job of issuing passes

---

13. *See* note 4 *supra* and accompanying text.

and soliciting wage contributions,[14] they were agents of the union for purposes of implementing the contribution program. Accordingly, the union is responsible for these union hall statements. *See* International Longshoremen's & Warehousemen's Union, CIO, Local 6, 79 N.L.R.B. 1487 (1948). And, even if the union did not specifically authorize the conditioning of the issuance of passes upon the signing of the contribution agreements, pass applicants could reasonably have believed that the imposition of this condition had been authorized. In such circumstances, the union cannot disavow responsibility. *See* NLRB v. Local 815, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Independent, 290 F.2d 99, 103 (2d Cir.1961).

Although a union threat that employees who did not agree to contribute would not be allowed to work might not, without more, violate section 8(b)(1) (A), *see Youngstown Sheet & Tube Company, supra*, the record in this case indicates that this threat was made more ominous by the occurrence of other events.

For example, George Springer, in the company of three or four other Military Division employees, was told at the union hall by a union agent that he was required to sign the contribution agreement in order to work and that there were "going to be some pretty big boys on that picket line." Springer and the employees with him could reasonably have been expected to believe that the union agent was expressing the position of the union on this question and that he would be physically prevented from working if he did not obtain a pass.

More important than the isolated Springer incident, however, is the congruence of the union agents' statements concerning the pass requirement with the mass picketing and pass-checking that occurred at most of the entrances to NCR's premises during the first week of the strike and at least "sporadically" thereafter until the end of the strike. At the hearing below, there was uncontradicted testimony concerning threats, intimidation, incidents of violence, and the blocking of ingress and egress by large groups of pickets who were attempting to ascertain which employees had obtained passes from the union. That such conduct is "coercive" within the meaning of section 8(b)(1)(A) is beyond dispute. *See* NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 362 U.S. 274, 290, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960); NLRB v. United Mine Workers of America, 429 F.2d 141, 146 (3d Cir. 1970). And, that such conduct, when utilized by a union to enforce its internal regulation of membership rights and responsibilities, constitutes "unacceptable means" and is "coercive" within the meaning of section 8(b)(1)(A) is similarly clear. *Scofield, supra*, 394 U.S. at 428, 430, 89 S.Ct. 1154, *Allis-Chalmers, supra*, 388 U.S. at 186, 189, 195, 87 S.Ct. 2001.

Petitioners contend, however, that there is not substantial evidence that the union sponsored or encouraged the violence and pass-checking. They point, for example, to the testimony of NCR attorney Brafford that the union could not control the picketers, and to the testimony of union officer Sturr that the

---

14. Union official Sturr testified:

Q. Now, at the time this strike commenced were you assigned any particular duties? A. Shortly after the strike commenced I and several others were assigned the job of collecting moneys from those employees who were going to be permitted to work during the strike in certain places.

Q. Who, besides you, was involved in collecting those contributions? A. There were several. I would say Mr. Robbeloth, Mr. Barefoot, and myself. We three were probably more involved than anybody else on a time basis. Mr. Arnett was in on it, too.

union and the individual employees were disorganized and did not seem to know how to conduct a strike or what to expect on the picket line. It is also argued that there is no direct testimony of any intimidation on the picket lines aimed specifically at non-pass-carrying Military Division employees; that, indeed, many of these employees testified that they were not checked for passes and that there was no picketing at their particular plant entrance. Finally, petitioners observe that the union relied on the honesty of the employees in collecting the wage contributions and that many employees did not make a contribution for the last week of the strike even though they had received passes for that week.

■ Although the union may not have actively sponsored the picket line incidents, it was in a position to and did reap the benefits inevitably flowing therefrom with respect to enforcement of the contribution program. Union officials admitted at the hearing that the pass requirement was adopted, at least in part, to appease the membership and to avoid violence on the picket line.[15] By the evening of November 19, there had already been reports of incidents involving roving bands of pickets. The incidents that occurred throughout the rest of the week, therefore, could not have come as a complete surprise to the union leadership. It was in these circumstances that union agents told employees that they would have to obtain a pass in order to work.

Further, the union made no effort to disavow either the union hall statements of its agents or the picket line incidents. For example, union officer Robbeleth admitted that he overheard the union hall remark made by a union man to George Springer, but he did not attempt to repudiate it. More important, the union apparently made no attempt to restrain the pickets from intimidating or obstructing the passage of employees who were attempting to cross the picket lines, even though it is conceded that un-

ion officers were present at various times on the lines. The union thus implemented a contribution requirement with full knowledge that picket line activities would tend to reinforce the impression fostered by its agents that obtaining a pass was a necessary condition to being allowed to work. The union's "silent approbation" of this conduct amounted to a utilization of unacceptable means to enforce its requirement that employees pay for the privilege of exercising their section 7 right to cross the picket lines. See NLRB v. Bulletin Company, 443 F.2d 863, 866–867 (3d Cir.1971), cert. denied, sub nom. Philadelphia Newspaper Printing Pressmen's Union Local No. 16 v. NLRB, 404 U.S. 1018, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972).

■ It is no answer to say that not all the Military Division employees were checked for passes or that some were able to work without passes. For one thing, a violation of section 8(b)(1)(A) can be found even when the coercion does not prove effective. See NLRB v. United Mine Workers of America, supra, 429 F.2d at 146; Local 542, International Union of Operating Engineers, AFL–CIO v. NLRB, 328 F.2d 850, 852–53 (3d Cir.), cert. denied, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964). For another, many of the employees who testified below indicated that they fully believed that obtaining a pass was necessary in order to work.[16] In fact, Robert Petry testified that after signing the contribution agreement, he tore up the agreement and went to work without a pass after discovering that there were no pickets at his work entrance. This indicates, of course, that when he obtained a pass, he fully expected to confront pickets at the plant who would require him to show it before he would be permitted to work.

■ The foregoing, we believe, clearly shows that the union utilized "unacceptable means" within the meaning of the Scofield test to enforce its

15. See note 2 supra.

16. See notes 3–6 supra.

contribution program. Not only does the uncontradicted evidence establish that the union employed threats of violence to assure compliance with the program, but it also demonstrates that no EIU member could escape the ostensibly internal rule by leaving the union because even non-members of the EIU were subjected to the union's coercion. Moreover, the physical coercion of the employees effected an interference with their employment status, and this linking of jobs with organizational rights is similarly proscribed under the *Scofield* test.

We hold, therefore, that substantial evidence on the record considered as a whole supports the Board's determination that the EIU violated section 8(b)(1)(A) by conditioning the right of employees to cross a picket line upon the payment of a wage contribution to the union.

### IV. THE SECTION 8(a)(1) VIOLATION

We recognize, at the outset, that NCR was under no obligation to allow any of its employees to work during the strike. However, NCR did elect to maintain the operations of its Military Division, and it invited all the employees of that division to work. In such circumstances, as respondent observes, an employer must offer the work available on an equal basis to all employees of the division selected by the company to operate during the strike. Employer discrimination between employees on the basis of activities protected under section 7 of the NLRA ordinarily will be a violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), and often of section 8(a)(3), 29 U.S.C. § 158(a)(3). *See, e. g.,* NLRB v. Anchorage Businessmen's Association, 289 F.2d 619 (9th Cir. 1961).

By enforcing the EIU's unlawful pass requirement, NCR discriminated against those employees who had exercised or might have wished to exercise their section 7 right to refrain from engaging in concerted activity by coming to work without a pass. By thus discriminating, NCR prima facie violated section 8(a)(1).

It is undisputed, however, that NCR took this affirmative step only because it feared for the safety of its employees. It had no anti-union animus, no desire to encourage membership in the union, and no motivation to interfere with protected activity. The company contends, therefore, that it was justified in acquiescing in and enforcing the pass requirement because its interference with its employees' protected activity was outweighed by its legitimate interest in safeguarding its employees' welfare and in cooperating with the United States Government.

Although this argument has some appeal, authority requires us to reject it.

An employer may have a business justification sufficient to excuse his interference with his employees' protected activity. Textile Workers Union of America v. Darlington Manufacturing Company, 380 U.S. 263, 269, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). And, although it has been held that the absence of an anti-union animus does not of itself afford a defense to an employer's interference with protected activity, NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964), and that "it is the tendency of an employer's conduct to interfere with the rights of his employees protected by Section 8(a)(1), rather than his motives, that is controlling," Welch Scientific Company v. NLRB, 340 F.2d 199, 203 (2d Cir. 1965); *see also* NLRB v. Hudson Motor Car Company, 128 F.2d 528, 533 (6th Cir. 1942), in the absence of proof of an unlawful motivation, an employer may interfere with protected activity without violating section 8(a)(1) unless the employer's conduct "is demonstrably destructive of employee rights and is not justified by the service of significant or important business ends." NLRB v. Brown, 380 U.S. 278, 282, 85 S.Ct. 980,

13 L.Ed.2d 839 (1965); *see* American Ship Building Company v. NLRB, 380 U.S. 300, 308–309, 85 S.Ct. 955, 13 L.Ed. 2d 855 (1965); *but see* American Ship Building, *supra*, 380 U.S. at 339, 85 S. Ct. 955 (Goldberg, J., concurring). *See generally* Christensen & Svanoe, Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality, 77 Yale L.J. 1269 (1968). Of course, the *Brown* and *American Ship Building* test may be merely another way of phrasing the balancing test enunciated in *Darlington*— that is, if an employer's conduct significantly interferes with protected rights and there is no legitimate business justification for this conduct, unlawful motive may be inferred: there could be no other reason for the employer to have taken such action. In such a situation, there is no need to inquire into motive and no need to balance competing rights. If the employer acts in good faith but mistakenly assumes that his conduct does not infringe on protected activity, as in *Burnup & Sims, supra*, the employer will be held to have interfered with protected rights without a sufficient business justificatification, and the absence of an improper motive will not exculpate him from a violation of section 8(a)(1). Here, too, there is no need to balance competing rights. Finally, if the employer acts in good faith and for legitimate business reasons, then it appears that under both the *Darlington* and the *Brown* formulations, his conduct will not violate section 8(a)(1) unless the interference with employee rights is so severe as to outweigh employer interests. *See generally* Christensen & Svanoe, *supra*.

Therefore, in a real sense, employer good faith or lack of unlawful motive is not a defense to a section 8(a)(1) charge. Instead, the absence of improper motive is relevant only to the extent it makes credible the asserted existence of legitimate business reasons for the employer's decision to take action that interferes with protected activity.

Applying these principles to NCR's asserted justification for interfering with its employees' fundamental statutory right to refrain from engaging in concerted activity, we hold that the Board correctly determined that NCR violated section 8(a)(1). We do not believe that the decision to require employees to obtain a pass because they might otherwise be subjecting themselves to danger on the picket line is the kind of justification envisioned by the Court under the test outlined above. Although NCR's motivation here is commendable, and although, as an original proposition, it might be said that any decision made by an employer relative to the welfare of his employees is a "business" decision, the statutory labor relations scheme does not contemplate reserving this type of decision to the employer.

 We are not here concerned with an employer's use of economic weapons against a union as in *Brown* or *American Ship Building, supra*, or with an employer's right to maintain his premises in an orderly fashion and to discharge disruptive or violent employees, as in *Burnup & Sims, supra*, or with inherently managerial prerogatives, as in *Darlington, supra*. These are the kinds of interests that justify the Board's or a court's determination that section 8(a)(1) is not an absolute. These are the kinds of interests that justify a weighing of economic and statutory considerations in order to delineate the proper roles of labor and management in our industrial society.

 We do not believe that the Congress intended, in formulating a delicately balanced national labor-management scheme, to assign to an employer the role of deciding for his employees how best to exercise their section 7 rights. It is not meet for an employer to tell his employees that, for their own good, they should (or should not) accede to pressures to engage in concerted activity. This paternalistic approach offends the philosophy embodied in the

language of section 7. An employee must determine for himself whether he wishes to cross a picket line to work at the employer's invitation; the employer cannot condition this invitation, for whatever reason, on the employee's surrender of his section 7 rights.

We hold that the Board properly determined that NCR violated section 8 (a)(1) by requiring Military Division employees to obtain a pass from the union as a condition to being allowed to work. By thus acquiescing in and enforcing the union's unlawful demand, NCR engaged in conduct that was demonstrably destructive of employee rights and without the justification of serving important business ends.

 Since this affirmative action by NCR occurred on November 22, and since the Board's order imposes both secondary liability on NCR to reimburse all the wage contributions made by employees and joint and several liability for backpay of all employees who did not work for varying periods during the strike, we must determine whether NCR is liable for any wage contribution or loss of backpay that occurred prior to November 22. The Trial Examiner, affirmed by the Board, held that NCR had an affirmative duty to take reasonable steps to protect the employees' right to work, and that NCR's failure to take such steps prior to November 22 constituted an independent violation of section 8(a)(1). We do not decide whether an employer has such a duty because we conclude that, in the circumstances of this case, the finding of the Board that NCR did not take reasonable measures is not supported by substantial evidence.

Between the evening of November 19, when the company first received reports of the wage contribution program, and the afternoon of November 22, when the company enforced the program, only two working days intervened. The testimony at the hearing below established that NCR officials, beginning on November 20, maintained a close surveillance of the situation at the company's gates to determine whether an injunction should be sought.[17] The testimony also establishes that the extent of the picket line coercion markedly increased on November 22, which prompted NCR officials to adopt the pass requirement and to seek an injunction the next day. We cannot say that this two-day delay was unreasonable. The company was justified in adopting a wait-and-see attitude on November 20 since it had no way of knowing whether the union would coerce employees to obtain passes. Since the company invited the employees to work regardless whether they agreed to the wage contribution program, and since it in good faith deemed the picket line incidents controllable until November 22, it did not behave unreasonably in deferring application for a court order until November 23.[18]

Further, it is difficult to see what other effective affirmative steps the company could have taken. It did tell the employees, before November 22, that they could come to work without agreeing to the wage contribution. Whether the issuance of company passes to members of the Military Division would have been effective is doubtful on the state of this record. It appears unlikely that the possessor of a company pass who did not also have a union pass would have been immune from picket line harassment.

Accordingly, we hold that there is not substantial evidence on the record to support the Board's conclusion that NCR violated section 8(a)(1) prior to its adoption of the union's pass requirement. The uncontradicted evidence clearly demonstrates that NCR acted

17. See note 9 supra.

18. It is interesting to observe that, even after the restraining order was obtained, the company maintained the pass requirement. This suggests that NCR officials were not at all convinced that the court order effectively protected its employees.

reasonably and properly until November 22.

## V. THE REMEDY

NCR does not challenge the backpay award entered against it (except for its denial that it committed an unfair labor practice). The unfair labor practice that it committed clearly supports the entry of a backpay order to make "the employees whole for losses suffered on account of an unfair labor practice." Nathanson v. NLRB, 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23 (1952). *See* NLRB v. J. H. Rutter-Rex Manufacturing Co., Inc., 396 U.S. 258, 263, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); NLRB v. Nelson Manufacturing Company, 326 F. 2d 397 (6th Cir. 1964). However, we modify the Board's order by eliminating NCR's liability for wages lost prior to November 22 because we have determined that the company did not violate section 8(a)(1) before that date.

The EIU argues that, since under the Board's own rule, section 10(c) of the NLRB, 29 U.S.C. § 160(c),[19] does not authorize a backpay award against a union when the union has interfered with an employee's ingress to his job site but has not caused a termination or disruption of his employment status, it should not be made jointly liable with NCR for backpay. *See* International Union, United Auto., Aircraft and Agr. Workers v. Russell, 356 U.S. 634, 641 n. 5, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); Progressive Mine Workers of America, International Union v. NLRB, 187 F.2d 298, 306–307 (7th Cir. 1951); International Union of Operating Engineers, Local 513, 145 N.L.R.B. 554, 555–56 (1963); Colonial Hardwood Flooring Company, 84 N.L.R.B. 563, 565–66 (1949). The Board contends that this rule is inapplicable here since it was the union's conduct in coercing the Military Division employees to obtain passes that caused the company to discriminate against them. Thus, the Board argues, the union was responsible "in a real sense" for the interference with the employment relationship.

▮▮▮▮ Assuming, without deciding, the validity of the Board's *Colonial Hardwood* doctrine,[20] we agree with the Board that the rule is inapplicable in this case, and that it is not necessary for a union to be found in violation of section 8(b)(2) of the NLRA, 29 U.S.C. § 158(b)(2),[21] for a backpay order to issue against it. We begin with the specific language of section 10(c): the Board may require backpay "of the labor organization . . . responsible for the discrimination . . . ." In interpreting and applying section 10(c), the Board has broad discretion, and when, in the exercise of this discretion,

19. Section 10(c) provides, in pertinent part:

If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any . . . unfair labor practice, then the Board shall . . . take such affirmative action including reinstatement with or without back pay, as will effectuate the policies of this subchapter: *Provided*, That where an order directs reinstatement of an employee, backpay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him. . . .

20. We observe that this rule appears to be inconsistent with the Court's discussion in *Scofield*, 394 U.S. at 428–431, 89 S.Ct. 1154, of the impermissibility of the linking of jobs with organizational rights. *Cf.* United Automobile Workers v. Russell, 356 U.S. 634, 641 n. 5, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

21. Section 8(b)(2) provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * *

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fee uniformly required as a condition of acquiring or retaining membership. . . .

it "makes an order of restoration by way of backpay, the order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA].'" NLRB v. Seven-Up Bottling Company of Miami, Inc., 344 U.S. 344, 346–347, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953), quoting Virginia Electric & Power Company v. NLRB, 319 U.S. 533, 540, 63 S. Ct. 1214, 87 L.Ed. 1568 (1943).

In *Colonial Hardwood,* the Board refused to order a union to make whole an employee who had been denied access by the union to his employer's plant. The Board reasoned that to order backpay in such circumstances would, in effect, compensate the employee for interference with his right of ingress to the plant, "as contrasted with compensation to him for losses in pay suffered by him *because of severance of or interference with the tenure or terms of the employment relationship between him and his employer . . . ."* 84 N.L.R.B. at 565 (emphasis added). In this case, by contrast, there was interference with the terms of the employees' employment relationship. The Military Division employees were sent home by NCR only because of the Union's coercive conduct, and it can therefore be said that the employees' loss of wages would not have occurred but for the actions of the union. Given the union's but-for responsibility for the discriminatory conduct of the employer, it clearly was proper for the Board to effectuate the policy of the NLRA by requiring the union to join with the company in making the employees whole "for losses suffered on account of an unfair labor practice." Nathanson v. NLRB, *supra.* Since "both the union and the employer may be, and normally are, held jointly and severally responsible for a wrongful discharge by the employer in response to the insistence of the union," NLRB v. Lexington Electric Products Co., 283 F.2d 54, 57 (3d Cir. 1960), cert. denied, sub nom. Local 3, International Brotherhood of Electrical Workers, AFL–CIO v. NLRB,

365 U.S. 845, 81 S.Ct. 805, 5 L.Ed.2d 810 (1961), we see no reason to absolve the union when an employer acts unilaterally to discriminate in reaction to union pressure but in the absence of a specific union request. Apropos, we believe, in this context is this statement of the First Circuit in NLRB v. Puerto Rico S. S. Ass'n., 211 F.2d 274, 276–277 (1st Cir. 1954):

> Both the employers and the unions have done acts which brought about the discrimination, and thus have each been guilty of unfair labor practices; and so far as liability is concerned, it is no matter that the employer-respondents may have committed the unlawful discrimination in response to coercive tactics by the unions. . . . Where, as in the present case, a consolidated complaint was issued both against the offending employers and the offending labor organizations, it is clearly within the broad discretionary power of the Board, in fashioning appropriate remedies, to make the liability for backpay joint and several
>
> . . . .

Here, there was clearly employer discrimination; there was clearly an interference in the employment status of the victims of this discrimination; and there was clearly union causation of the discrimination. In these circumstances, the Board did not abuse its discretion in ordering the EIU to be jointly and severally liable with NCR for backpay lost from November 22 to the end of the strike.

However, since the Board adheres to its *Colonial Hardwood* rule in this case, the EIU should not be liable for backpay lost prior to November 22 since it was not until that date that the company affirmatively enforced the union's pass requirement. There were apparently three employees who did not work prior to November 22—Edward Dunn, Elmer Houston, and Don Kesinger. Although we entertain doubts about the validity of the *Colonial Hardwood* rule in light of *Scofield,* we have

no alternative to applying it here. The Board's order is therefore modified to exclude these three employees from the backpay award for the period preceding November 22.

Both NCR and the EIU attack the reimbursement provisions of the Board's order. Both contend primarily that there is no evidence of their having coerced any employee, a contention that we have rejected. NCR argues additionally that this award is punitive rather than remedial since it has already paid the employees their full wages, and the union, and not it, received the contributions. The EIU argues that the Board had the burden of proving that each employee for whom reimbursement was ordered contributed because of coercion. The union contends that

> [a]bsent specific evidence to the contrary, we must assume that at least the union members who did not testify, willingly and voluntarily made the contributions. To order reimbursement will provide them a windfall. These loyal union members would have made contributions regardless of the particulars of the arrangements.

We see no merit in these contentions.

We consider the validity of this award in light of the Supreme Court's observation that "[i]n fashioning its remedies under the broad provisions of § 10(c) of the Act . . ., the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." NLRB v. Gissel Packing Company, Inc., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969). The Board has wide discretion in determining the scope of remedial action necessary to expunge the effects of unfair labor practices, see Virginia Electric & Power Company v. NLRB, supra, 319 U.S. at 542, 63 S.Ct. 1214; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. NLRB, 427 F.2d 1330, 1333 (6th Cir. 1970); Weltronic Company v. NLRB,

419 F.2d 1120, 1123 (6th Cir. 1969), but any affirmative action ordered by the Board must be remedial rather than punitive in nature and must be limited to "removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act." Local 60, United Brotherhood of Carpenters and Joiners of America, AFL–CIO v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961); Consolidated Edison Company v. NLRB, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

Accordingly, although it is settled that the Board, in the exercise of its informed discretion, may order an employer or a labor organization, or both, to reimburse employees for funds exacted as the direct result of coercive tactics prohibited by provisions of the NLRA, see, e. g., Virginia Electric & Power Company v. NLRB, supra; NLRB v. SuCrest Corporation, 409 F.2d 765 (2d Cir. 1969); NLRB v. Wells, 283 F.2d 689 (6th Cir. 1960); NLRB v. Revere Metal Art Company, 280 F.2d 96, 100–101 (2d Cir.), cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 189 (1960); NLRB v. General Drivers, Chauffeurs and Helpers, Local Union No. 886, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, 264 F.2d 21, 23 (10th Cir. 1959), the Board cannot order reimbursement in the absence of proof that the funds would not have been paid but for the illegal coercion. Local 60, Carpenters v. NLRB, supra; Morrison-Knudsen Company v. NLRB, 276 F.2d 63, 74–76 (9th Cir. 1960), cert. denied, sub nom. NLRB v. Hod Carriers, Building and Common Laborers Union of America, Local No. 324, AFL–CIO, 366 U.S. 910, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961); see Local 60, Carpenters v. NLRB, supra, 365 U.S. at 657–658, 81 S.Ct. 875 (Harlan, J., concurring); Virginia Electric & Power Company v. NLRB, supra, 319 U.S. at 545, 63 S.Ct. 1214 (Frankfurter, J., concurring); Western Union Telegraph Company v. NLRB, 113 F.2d 992, 997

(2d Cir. 1940). The Board does not have broad authority to impose sanctions solely for the purpose of deterring future violations of the Act. Republic Steel Corporation v. NLRB, 311 U.S. 7, 11–12, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

 With respect to the EIU's liability for reimbursement, then, two questions must be considered: is the remedy a reasonable, non-punitive measure that would "recreate the conditions and relationships that would have been had there been no unfair labor practice" (Local 60, Carpenters v. NLRB, *supra,* 365 U.S. at 657, 81 S.Ct. at 879 (Harlan, J., concurring)); and, if so, must the union reimburse those employees who were not shown specifically to have been coerced? We believe that both questions must be answered in the affirmative.

As we have previously observed, the bylaws of the EIU provided that any union member who crossed a picket line during an authorized EIU strike would be liable to a fine of $25 for each crossing. EIU officials, however, after being apprised of the Government's request that Military Division employees be permitted to work, decided not to utilize this bylaw and to issue picket line passes to the employees. Following the communication of this decision to NCR officials, the union leadership determined that it would request each Military Division employee to make a wage contribution. Had this request truly been precative, and had the contributions actually been voluntary, as the EIU contends, presumably passes would have been issued to employees who elected not to contribute, and those who were union members would not have been liable for a $25 fine for each picket line crossing.

By conditioning the issuance of picket line passes on payment of the wage contributions, however, the EIU deprived the Military Division employees of any free choice in the matter. Every employee in that division, whether union member or not, was deprived of his section 7 right to decide whether to accept the company's invitation to work without enriching the union's treasury. It is no answer to say that the union could have imposed a fine on its members who elected to work without obtaining union authorization. In the first place, the union suspended enforcement of the fine provision and has contended, both in the proceedings below and in this court, that it merely sought voluntary contributions in lieu of a fine so that the Military Division could be kept in operation during the strike. Thus, members who contributed a portion of their wages contributed funds that, by the union's own admission, they could otherwise have retained. Second, even if the union had declared its intention to impose a fine on members who worked without contributing a third of their wages, these members had the section 7 right to resign from the union and thereby avoid subjecting themselves to the penalties prescribed by the union bylaws for crossing a picket line. *Booster Lodge 405, supra,* 459 F.2d at 1152–1155; District Lodge No. 99 and Lodge No. 2139, International Association of Machinists & Aerospace Workers, AFL–CIO, 5 CCH Lab.L.Rep. (1972 CCH NLRB Dec.) ¶ 23,782 (1972); *but see* NLRB v. Granite State Joint Board, *supra; cf.* Local 1255, International Association of Machinists & Aerospace Workers, AFL–CIO v. NLRB, 456 F.2d 1214 (5th Cir. 1972). The union's illegal coercion, however, deprived its members this option. Indeed, in this case even non-members of the EIU were coerced into complying with the union's wage contribution program.

In the circumstances of this case, therefore, we conclude that reimbursement of the wage contributions is an appropriate means of erasing the effects of the union's unfair labor practice and thereby placing the employees in the position in which they would have been had there been no illegal conduct. The contributions were the direct result—in fact, the primary objective—of the unlawful coercion, and it would not be consistent to require the union to cease and desist exacting "contributions" and to

permit it to retain funds thus illegally collected. Refunding these moneys is "a remedial measure in the competence of the Board to impose [since] there is support in the evidence that their [exaction] was induced, obtained, or retained in violation of the Act." Local 60, Carpenters v. NLRB, *supra*, 365 U.S. at 655–656, 81 S.Ct. at 878. *See* NLRB v. Cadillac Wire Corp., 290 F.2d 261, 263 (2d Cir. 1961).

▮ We hold, moreover, that the Board properly ordered the EIU to reimburse all the Military Division employees. The evidence adduced at the hearing below demonstrated a pattern of widespread, indiscriminate pressure on the employees to agree to the wage contribution program, and the Board was entitled to infer from this, in the absence of testimony by specific witnesses that they paid voluntarily, that no employee freely chose to make the contribution. *See* NLRB v. Link-Belt Company, 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368 (1941); Sheraton-Kauai Corporation v. NLRB, 429 F.2d 1352, 1357 (9th Cir. 1970); NLRB v. Jan Power, Inc., 421 F.2d 1058, 1064 (9th Cir. 1970); NLRB v. Revere Metal Art Company, *supra*, 280 F.2d at 101. The union coercion was calculated to force the employees to pay, and the subsequent payments were thus the foreseeable consequences of the union's conduct. *See* NLRB v. General Drivers, Chauffeurs and Helpers, Local Union No. 886, Affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, 264 F.2d 21, 23 (10th Cir. 1959). The burden should not be on the General Counsel, in such a case, to show that each employee was coerced; rather, once an initial showing of substantial and widespread coercion is made, it is incumbent on the union or employer, as the case may be, to come forward with evidence that specific employees were not coerced. Indeed, it has been held that threats made to a small number of a group of employees can support an order requiring reimbursement to all the employees in the group. NLRB v. Teamsters and Allied Workers, Hawaii Local 996, 313 F.2d 655, 660–661 (9th Cir. 1963). As the court stated in that case:

> It would be a unique doctrine of law that would prevent the Board, if it is convinced by the evidence that, in the circumstances, an illegal threat of discharge made to one or several of a relatively small body of workmen had the effect of coercing others or all of the workmen in the group, from making a finding to that effect and basing an order on that finding. In the Board's appraisal of the problem, the circumstances would be of great importance.

313 F.2d at 660.

It may be that the reimbursement order will result in providing a windfall to "a lot of old-time union men" (Morrison-Knudsen Company v. NLRB, *supra*, 276 F.2d at 76) and that the Board should have explored means of determining which employees actually were coerced rather than uncritically adopted the proposals of the Trial Examiner. By the same token, the union was not justified in remaining silent in the face of testimony about the pervasive nature of the union's coercive tactics. By establishing on cross-examination of the General Counsel's witnesses the fact that some employees did not pay the wage contributions during the last full week of the strike, the union did nothing more than buttress the conclusion that the employees who paid during the strike did so because they felt coerced: they stopped paying when they believed that it was safe to do so. No employee testified that he made the payments freely and voluntarily. Even the few who indicated that they were able to pass through the gates without passes showed by their testimony that their eventual decision to sign the contribution agreements resulted from union coercion.[22]

---

22. For example, Robert Petry (*see* note 7 *supra*) was eventually forced to pay because NCR, as the direct result of the EIU's coercive tactics, required it. EIU

Accordingly, the Board acted well within its authority in ordering the union to reimburse all the employees. As Judge Learned Hand phrased it in an analogous context:

> However, as in our decision in National Labor Relations Board v. Revere Metal Art Co., 280 F.2d 96, 101, we will not direct the Board to make an inquiry in each case how far the employee was coerced. We there said: "Though the Board might have excluded the employees who had voluntarily signed union cards before September 1 from the reimbursement provision, it did not abuse its discretion in not doing so since these employees may well have remained in the union only because of the status it had unlawfully acquired. For the courts to require a determination of the attitude of each employee in every case would impose impossible administrative burdens."

NLRB v. Cadillac Wire Corp., *supra*, 290 F.2d at 263.

■ Completely without merit is the company's argument that the fastening of secondary liability on it amounts to a punitive measure because it has already paid the funds to the employees. We see no difference between the reimbursement order in this case and an order requiring an employer to reimburse employees for dues and initiation fees that were illegally checked off from the employees' wages. *See, e. g.,* NLRB v. SuCrest Corporation, *supra*; NLRB v. Revere Art Metal Company, *supra*. In either situation, the employer may be required to pay twice if the union, which received the illegal exactions, does not return the money. The validity of the order is analyzed in terms of its effect on the employees—does it restore to the employees what they lost by reason of the unfair labor practice. In this case,

"[b]y hypothesis the unlawful payment . . . was coerced, and the repayment of the whole amount merely put the employees in the same position they would have been in had the statute been obeyed." NLRB v. Cadillac Wire Corp., *supra*, 290 F.2d at 263. Moreover, NCR was made only secondarily liable for the reimbursement and will thus have to pay only if the union defaults. Given the relative culpability of the parties, we believe that this was an appropriate exercise of the Board's discretion. *See* NLRB v. Bulletin Company, *supra*; NLRB v. Revere Metal Art Company, *supra*, 280 F.2d at 101.

However, since we have held that the company did not commit an unfair labor practice prior to November 22, its secondary liability for reimbursement will attach only with respect to wage contributions paid for that date and thereafter.

As modified by this opinion, the order of the Board is enforced.

EDWARDS, Circuit Judge (concurring in part and dissenting in part).

The evidence of union coercion in this record which is quoted in the opinion of the court constitutes substantial evidence of an unfair labor practice and I concur in the enforcement of the NLRB order as to the union.

I do not, however, find substantial evidence of an unfair labor practice to support a major portion of the Board's order directed against the company. N. C.R. did of course agree with the government and the union to operate a unit which was producing military material. But there is no evidence of any complicity of N.C.R. in the union wage deduction scheme or the coercive union measures used to enforce it.

I would not enforce any portion of the Board order imposing secondary liability on the company for the union violations.

member Donald Beam testified that he signed the contribution agreement because his fellow employees were being forced to obtain union passes. He stated that "it wasn't right for some of us to come in and not those people. That would be just like a rat; to come in and have someone else denied the privilege of coming in."

N.C.R. claims in effect that its decision not to put employees without union passes to work was based on sound business reasons. As to this, I find no evidence to the contrary. It is clear, however, that the refusal to put these employees to work did have a discriminatory effect whether it was intentional or not.

I would therefore modify the Board's order to require that N.C.R. make back wage payments only in the cases where it directly refused employment on the ground just referred to.